# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 07-01264-TLM** |
| **LEE THOMAS JORDAN and** | ) | |
| **SHARON ANNE JORDAN,** | ) | |
| **dba Jordan Meadows,** | ) | |
| | ) | **Chapter 11** |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| **LEE THOMAS JORDAN and** | ) | |
| **SHARON ANNE JORDAN,** | ) | |
| **dba Jordan Meadows,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adv. No.  07-06056-TLM** |
| | ) | |
| **JEFF KRONEBERGER,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

## I.    INTRODUCTION

Lee and Sharon Jordan ("Debtors" or "Plaintiffs') filed a voluntary chapter

11 bankruptcy petition on August 13, 2007, and they serve as debtors in

MEMORANDUM OF DECISION - 1

possession in their chapter 11 case.  *See* § 1101(1).[1]  Exercising the powers

granted debtors in possession, *see* § 1107(a), they brought the instant adversary

proceeding against creditor Jeff Kroneberger ("Defendant").  In this proceeding,

Plaintiffs contend Defendant was the recipient of a fraudulent transfer avoidable

under § 548(a)(1)(B), which provides:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
> . . .
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Section 548(a)(1)(B).[2]

---

[1]  Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, Title 11, U.S. Code, §§ 101-1532.

[2]  Section 548(a)(1)(A) addresses transfers made or obligations incurred "with actual intent to hinder, delay, or defraud."  Intentionally fraudulent transfers are not at issue in this proceeding.  Plaintiffs allege only "constructively fraudulent" transfers under § 548(a)(1)(B).

MEMORANDUM OF DECISION - 2

The subject transfer was the November, 2006, execution of a deed of trust on certain real property located in Canyon County, Idaho, to the benefit of Defendant, securing a contemporaneous $4,342,346.32 promissory note from Debtors to Defendant, all of which occurred in conjunction with a comprehensive mediated settlement of certain litigation.

In addition to the § 548 issues, Defendant previously filed, as a secured creditor in the chapter 11 case, a motion for relief from the § 362(a) stay in order to continue with a nonjudicial foreclosure of the subject deed of trust. That motion, as finally structured, alleges relief is proper under § 362(d)(1), (2) and (3). By agreement of the parties, a § 362(e) final hearing on the stay relief motion was postponed and scheduled for evidentiary hearing simultaneous with trial in the adversary proceeding.[3]

The final stay relief hearing, and trial on the avoidance action under § 548, occurred on May 6 and 7, 2008. The matters were taken under advisement on May 15 following the submission of post-trial briefs. This Decision constitutes the Court's findings of fact and conclusions of law. *See* Fed. R. Bankr. P. 7052 (applicable to the adversary proceeding and, by incorporation under Fed. R. Bankr. P. 9014, applicable to the stay relief motion as a contested matter under

---

[3] The parties thus waived the time limits on hearing and resolving the stay relief motion. *See* § 362(e)(2)(B)(i). Since the stay motion was simultaneously heard, the Court will docket this Decision in the adversary proceeding and the main chapter 11 case.

MEMORANDUM OF DECISION - 3

§ 362).

The Court concludes Plaintiffs failed to carry their burden of proof on the

§ 548(a)(1)(B) contentions that an avoidable constructively fraudulent transfer

occurred.  Judgment will therefore be entered for Defendant in the adversary

proceeding.  The Court further concludes that stay relief is appropriate under

§ 362(d).

## II.    FACTS AND BACKGROUND

Lee Jordan is 69 years old and has been married to Sharon for over 40

years.[4]  They have four living children, including a son, Douglas Jordan.  Douglas

is married to Alayna Jordan.  Lee is retired, and his and Sharon's income comes

from Social Security and a small retirement benefit from one of Lee's prior

employers.

For most of his life, Lee lived on farm ground in Canyon County, Idaho,

near the city of Caldwell.  Originally, this property was owned by his parents.  In

the 1980's, Lee inherited a 25.79 acre parcel ("Parcel 1") and a 35.68 acre parcel

("Parcel 3").  *See* Ex. 100 (record of survey).[5]  Lee's half-sister, Jean Settler and

---

[4]  For clarity and ease of exposition, the Court at times refers to the various individuals by
their first names.

[5]  At some point, Lee caused three 1½ acre lots along the eastern boundary of Parcel 3 to
be separately described, intending that they be for the use of his children.  County zoning
restrictions apparently prohibited severance of a fourth lot.  Defendant acknowledged that his
deed of trust did not encumber the three lots.

MEMORANDUM OF DECISION - 4

her brother each inherited about 20 acres. Jean ultimately acquired her brother's

interest, creating a 39.78 acre parcel ("Parcel 2"), which became known and at

trial was referred to as the "Sweet Jean Parcel."[6] There is also an approximately

15 acre parcel, to the northeast and immediately adjacent to the Sweet Jean Parcel,

upon which Lee and Sharon's present house sits.

The three parcels are adjacent and form an inverted and reversed "L" shape,

bordered on the east by Midland Road and on the south by Ustick Road. They lie

next to an elementary school to the southwest, and residential subdivisions to the

west. The properties are roughly equidistant between Interstate 84 to the south

and State Highway 20 to the north, both major commuting corridors in the Boise

or Treasure Valley region.

During the early 2000's, this area was undergoing a rapid transition from

agricultural uses to residential subdivisions, and significant profits were being

realized by those converting farm ground to such development.[7] In the spring of

2005, Lee asked Douglas for assistance in obtaining financing with which to

acquire the Sweet Jean Parcel and to develop it together with the two parcels, 1

and 3, already owned by Lee and Sharon into an approximately 100 acre

---

[6] At some point, it appears that ownership of this parcel was transferred from Jean to Sweet Jean, LLC. The implication was that Jean still had some significant interest in the property through the LLC.

[7] At that time, neither Lee nor his family members actively farmed the property. It instead was leased to others to farm.

MEMORANDUM OF DECISION - 5

residential subdivision to be called Jordan Meadows.

Lee claims no personal knowledge or experience in real estate development. Douglas had some prior, though limited, experience in subdivision development. This experience started with his work in landscaping maintenance and contracting, which was his occupation for some 15 years. In 2002, Douglas worked on small (*e.g.*, half dozen lot) developments, working on obtaining "entitlements" (county development approvals) and supervising contractors, and he also took university classes in construction management. In 2004-2005, Douglas worked on larger subdivision developments in Nevada, primarily dealing with landscaping and common area aspects and supervising "horizontal construction" meaning work from the ground level down, including streets, utilities, water and sewer, and the like.

Douglas and Alayna created a "packet" of information concerning the possible development of Jordan Meadows and simultaneously looked for financing and for more experienced development assistance, even though Douglas contemplated "managing" the actual physical development. Through Alayna's brother, Douglas learned of and approached Defendant. Defendant is a real estate broker and developer with 15 years experience and holds Utah real estate and broker licenses. He and Douglas first met to discuss the project and a possible relationship in the summer of 2005 in Mesquite, Nevada and, several weeks later,

MEMORANDUM OF DECISION - 6

Defendant came to Idaho to view the property and continue the discussions.

Defendant believed the properties had development potential given the overall market in the area, and he specifically noted that the prospective Jordan Meadows subdivision was located adjacent to a school and near other subdivisions.  He and Debtors, commencing in September, 2005, entered into certain agreements regarding the purchase and development of the properties.

### A.    The purchase contracts

On September 27, 2005, Defendant as buyer and Debtors as sellers executed a real estate purchase contract for Parcel 3.  Ex. 101; Ex. 202.  Pursuant to an attached Addendum No. 1 to this contract, the parties agreed to the following terms:

1.   Settlement was to occur between January 31, 2006 and December 31, 2006, with the exact date to be determined by Defendant, and Debtors to be provided 30 days notice thereof.

2.   The purchase price would be $55,000.00 per acre following a survey by Debtors.  (For the 39.37 acres shown on this contract, the price would be $2,165,350.00.)  Defendant agreed that Debtors could deduct, with his approval, four "children lots"[8] and frontage on Ustick Road.

---

[8]  Though there were then three lots, they needed to be reduced in size and a fourth added.

MEMORANDUM OF DECISION - 7

3.   Defendant paid $2,500.00 earnest money, and agreed to increase the earnest money to $400,000.00 upon closing.  He also agreed to cooperate with Debtors on a 1031 tax exchange.

4.   Defendant agreed to close within 30 days of receipt of annexation of and final subdivision plat approval for the property by the city of Caldwell.[9]

5.   Debtors were responsible for improvements and utilities along the two public roadways, and the 4 children lots, to the extent required by Caldwell.

6.   Debtors granted Defendant the "legal rights" to seek to annex the property into Caldwell and to work toward final platting, and agreed to "participate" with Defendant in that process.

7.   Debtors disclosed that they were in the process of or intended to purchase the Sweet Jean Parcel, and they agreed to give Defendant a "first option" to purchase it for $60,000.00 per acre.  Closing on that property would be upon final plat approval, to be in conjunction with platting the other parcels, and not before Debtors had held the Sweet Jean Parcel for at least one year, unless otherwise agreed.

An Addendum No. 2 to this contract was executed in January, 2006.  Ex. 102; Ex. 203.  It added a term under which Defendant would make arrangements

---

[9]  According to Defendant, the closing prerequisite of annexation approval was critical to the ability to use the property to obtain the financing required to close the transaction.

MEMORANDUM OF DECISION - 8

to loan Debtors up to $500,000.00 between January and June, 2006.  Debtors

agreed that the property could be used to acquire a line of credit in order to

provide this financing.  Further, in regard to the 39.78 acre Sweet Jean Parcel,

instead of providing Defendant an option to purchase, Debtors agreed to assign

their purchase contract to Defendant at a price of $37,500.00 per acre.  The

addendum recites that Defendant and Debtors "would be partners" on this parcel,

with Debtors having a 20% partner interest and sharing in the profits with

Defendant on that property.[10]

     According to Debtors, the purpose of the loan up to $500,000.00 was to

enable Debtors to construct a residence on the 15 acres immediately north of the

Sweet Jean Parcel.  According to Defendant, the provision was requested because

Debtors wanted some of the money from the anticipated sale of their properties

"up front" (*i.e.*, prior to closing), and he understood some portion was to be used

for medical and other bills or purchase of personal property.[11]  Ultimately,

$200,000.00 of the $500,000.00 referred to was advanced by Defendant to

---

[10]  Debtors view this change in treatment of the Sweet Jean Parcel as reflective of an
intent that they and Defendant would mutually develop Jordan Meadows.  Defendant testified
that he thought it was an approach that was designed to appear fairer than the original, should
Jean learn that Debtors would pay her $37,500.00 per acre for her 39 acres and immediately sell
that same property for substantially more per acre.

[11]  Defendant indicated that this was structured as a "loan" from him to Debtors rather
than as an advance on the purchase price, which he says Debtors had requested, in order to avoid
tax consequences.

MEMORANDUM OF DECISION - 9

Debtors.  A portion went toward construction of the residence, and another portion went to the purchase of a backhoe.  Debtors completed the construction of the residence through a third-party loan, and disclose in their schedules an obligation to Aurora Loan Servicing of $525,412.16.  Ex. 123 at sched. D.

Another September 27, 2005 contract was executed, this one involving Parcel 1.  Ex. 103; Ex. 201.  This parcel, noted as comprising 25.78 acres, was also sold to Defendant for $55,000.00 per acre, for an agreed total purchase price of $1,417,900.00.  Under its Addendum No. 1, which mirrored the first addendum to the contract on Parcel 3, closing was to occur upon annexation and final plat approval by Caldwell.  As with the first contract, Defendant paid $2,500.00 earnest money.

On December 9, 2005, Lee entered into a real estate contract with Sweet Jean, LLC, for purchase of the Sweet Jean Parcel for $1,500,000.00[12] with settlement to occur by October 30, 2006.  Closing was contingent on annexation and final platting and on the closing of the purchase agreement on Parcel 1.  Ex. 104; Ex. 204.[13]

### B.    Disputes, and litigation

In furtherance of these several agreements, Defendant in January, 2006,

---

[12]  This was slightly over $37,700 per acre.

[13]  There were two subsequent addenda to this agreement, both of which extended due diligence or settlement dates.  Ex. 105; Ex. 204.

MEMORANDUM OF DECISION - 10

retained Briggs Engineering to survey the parcels and to prepare concept plans and

preliminary plats for the Jordan Meadows residential subdivision.  *See*, *e.g.*, Ex.

205.  Briggs and the parties proceeded with efforts to get Caldwell to agree to

annex the property and approve a plat for the subdivision.[14]

An entity, Jordan Meadows, LLC, was apparently formed by Defendant,

Douglas and Alayna Jordan, and an individual named James "Skip" McWhorter.[15]

The concept appeared to be that the LLC would be the vehicle by which the

subdivision would be developed by the several parties.  The LLC's name appears

on plats prepared by Briggs Engineering, and it is referred to in reports of decision

from Caldwell.  *See* Ex. 214 (preliminary plat map, indicating the LLC as

"owner"); Ex. 129 at 2 (Caldwell order of decision, referring to the LLC as

"applicant" and to Lee and "Jean Jordan" as "owners").  The litigants all agree that

the subject properties were never transferred to the LLC.  Additionally, the

testimony indicates that no operating agreement was ever agreed upon and

executed for the LLC.

---

[14]  In March, 2006, Defendant purchased some additional property, generally called the "cul-de-sac parcel," on Midland Road from Josh and Stacey Wilhelmsen for $12,000.00.  Ex. 131.  This allowed for an additional few lots to be added to the development.  The total number of lots in the subdivision was 318 according to the annexation decision by Caldwell.  Ex. 129, Ex. 215.  Witnesses' testimony about the total number of lots varied, though all were in the 310 to 320 range.

[15]  Formation of this LLC was mentioned in testimony and is referred to in a later document, Ex. 222 (Assignment Agreement).  Formation or registration documents for the limited liability company were not introduced.

MEMORANDUM OF DECISION - 11

Lee and Douglas both testified that there came a time in early 2006 when they determined that the arrangements with Defendant were not working and that they wished to terminate their association with him.[16]  At the same time, however, there was ongoing activity in furtherance of the development, including the process of obtaining city approval, as corroborated in the recitals in Caldwell's annexation order describing the dates of meeting presentations and other submittals in early and mid-2006.

On May 16, 2006, attorneys writing on behalf of Debtors, and evidently also on behalf of Douglas and Alayna, sent a letter to an attorney for Defendant proposing a "buyout" of Defendant for a total of $750,000.00.  Ex. 209.  In this proposal, Debtors indicated a value of the ground at about $75,000.00 per acre.

---

[16]  By way of example, Debtors argued that the designation of the buyer on the contracts as "Jeff Kroneberger *or assigns*" was meant to reflect an agreement, evidently verbal, that Defendant would transfer the properties (or, since their purchase had not yet closed, somehow assign the rights under the purchase contracts) to a "development LLC."  That LLC, they indicate, would include as members Lee and Douglas Jordan and their wives, McWhorter, and Defendant. They further allege disagreements arose as to the formation, membership and ownership of that LLC.  Defendant agrees that "assigns" gave him the potential of transferring the properties into a limited liability company, but disagrees that it would be "Lee's LLC" or that Douglas would have any interest in such an LLC.  There were a number of other, similar disputes regarding money, control and performance of the obligations in the contracts, many of which are also identified in the parties' briefing.  *See*, *e.g.*, Adv. Doc. No. 11 (Plaintiffs' trial memorandum) at 3-6; Adv. Doc. No. 12 (Defendant's trial memorandum) at 4-5.  Resolution of these testimonial disputes is not important to the issue before the Court in this litigation.  These disputes between Debtors and Defendants were settled as a result of the mediation discussed below, and the question presented under § 548(a)(1)(B) is whether the transfers occurring in consummating that mediation were for reasonably equivalent value.

MEMORANDUM OF DECISION - 12

*Id.*[17]  This letter also referred to ongoing "disputes" and to Debtors' earlier April,

2006 proposal to "buy out" Defendant for $410,000.00.

The offer was not accepted and two weeks later, on May 30, 2006, Debtors'

Attorneys filed on behalf of Debtors a complaint in the Idaho state court against

Defendant.  Ex. 210 (complaint in <u>Lee and Sharon Jordan v. Jeff Kroneberger</u>,

Case No. CV06-5925, Third Judicial District, State of Idaho, in and for Canyon

County).  This litigation was removed to the U.S. District Court for the District of

Idaho by Defendant, commencing Case No. CIV-06-00241-EJL.  Exs. 110, 111.[18]

Debtors' initial complaint sought judgment declaring the purchase contracts

unenforceable based on a lack of description of the properties sufficient to satisfy

Idaho's Statute of Frauds and, after removal, they amended the complaint to

include a cause of "fraudulent inducement" based on Defendant's alleged failure

to assign the contracts to a limited liability company whose members would

include Debtors and their son.  Exs. 109, 112.  Defendant answered the complaint,

and filed a counterclaim seeking either specific enforcement of the contracts or

damages for their breach.  Ex. 113, 212.  Defendant also filed a lis pendens of

---

[17]  The firm of Givens Pursley LLP authored the letter, and thereafter appeared as counsel for Debtors in state court litigation and a subsequent mediation, all described more fully below. They will be referred to as "Debtors' Attorneys."  A different firm represents Debtors in the chapter 11 and in this adversary proceeding.  Debtors' Attorneys are listed as creditors in the chapter 11 case with an unsecured claim of slightly over $108,000.00.  Ex. 123 at sch. F.

[18]  The litigation, state and federal, is referred to as the "Action."

MEMORANDUM OF DECISION - 13

record.  *See* Ex. 119 (later release of lis pendens, referencing its June 22, 2006

recordation date and instrument number).

The value of the properties was increasing through early 2006.[19]  Douglas

acknowledges receipt of a letter of intent from D.R. Horton, Inc., Ex. 213,

expressing interest in purchasing the development for $14,265,000 (effectively

$45,000/lot for 317 lots).[20]  He stated that he notified Debtors of this proposal.

According to Defendant, that offer was lowered to $35,000.00/lot (about $11

million total, or $110,000.00 per acre) before it was withdrawn.  Another letter of

intent was received in August, 2006, from Wentworth Development, LLC, at

$8,924,000.00, or roughly $89,000.00 per acre.  Ex. 217.

### C.    Mediation

On November 13, 2006, a mediation session took place before former state

court judge, D. Duff McKee.  Lee was present with Debtors' Attorneys.  Douglas

and Alayna were present with separate counsel.  Defendant and his counsel were

present.  The mediation started in the morning and lasted into the evening, over

some 12 to 14 hours according to the witnesses.  All agree that the negotiations

---

[19]  Defendant contends that Debtors knowledge of the escalating market, and of the enhanced value that fully entitled "paper lots" would bring, led Debtors to back away from some earlier threats to cease co-operating on the annexation and plat approval effort.  City approval was obtained in July, 2006.  Ex. 129.

[20]  For ease of comparison to other figures discussed, this would be $142,650.00 per acre for the 100 acre development.

MEMORANDUM OF DECISION - 14

took place between and among counsel and Judge McKee, and never between the

Jordans and Defendant personally.  All parties and their lawyers convened at the

end of the session to approve and execute a handwritten "term sheet" reflecting the

parties' final settlement.  *See* Ex. 219 ("Mediation Agreement").

Defendant testified that he started the mediation with the idea of enforcing

his purchase contracts, but probably having to pay additional sums to Debtors, as

he believed that their intent was to receive more for the sale of their property than

the contracts provided.  However, he indicated, the mediator made it clear that the

other side was adamant about severing any relationship and "buying him out."

Lee and Douglas both confirmed that the Jordans wanted to "pay off" and be rid of

Defendant and would sell the property to some other party to accomplish that goal.

The Mediation Agreement contained the following terms.  Defendant's

contracts for the purchase of Parcels 1 and 3 would be cancelled and he would

release the lis pendens.  Defendant would convey to Debtors the cul-de-sac parcel.

Defendant agreed to loan Debtors $1,550,000.00 plus closing costs to enable

Debtors to complete the Sweet Jean Parcel acquisition.  Debtors agreed to repay

Defendant that new advance ($1,550,000.00 plus costs) and an additional

$2,662,000.00.  This obligation would be represented by a note and secured by a

deed of trust on the now-aggregated Jordan Meadows properties (Parcels 1 and 3,

the Sweet Jean Parcel and the cul-de-sac parcel).  The note would be due on April

MEMORANDUM OF DECISION - 15

16, 2007, a date of importance to Defendant because of tax consequences. Defendant's claims to repayment of the $200,000.00 he earlier advanced Debtors and repayment of the engineering and development costs that he had incurred through the date of the mediation in obtaining Caldwell annexation and plat approval were included in the note amount. The Action would be dismissed with prejudice, and all disputes between and among the parties settled. They would bear their own fees and share equally in the cost of the mediation. Finally, they agreed that any disputes over the documentation or implementation of the agreement would be submitted to Judge McKee for arbitration.

All parties and their attorneys executed the Mediation Agreement. The attorneys thereafter prepared the documentation required to consummate it. Defendant wire transferred $1,590,000.00 to a title company for Debtors' benefit and use in acquiring the Sweet Jean Parcel. Ex. 225. Defendant transferred the cul-de-sac parcel to Debtors. Ex. 223. A promissory note to Defendant in the amount of $4,342,346.32 payable April 16, 2007, was executed by Debtors. Ex. 226. A deed of trust on Parcels 1, 2 and 3 and the cul-de-sac parcel was also executed by Debtors, and was recorded by Defendant on November 21, 2006. Ex. 227; Ex. 228. The litigation was dismissed, Exs. 229, 230, and the lis pendens released, Ex. 231. Ultimately, there was a Mutual Release and Indemnity Agreement, signed by Douglas and Alayna as well as by Defendant and Debtors, settling all issues. Ex. 221.

MEMORANDUM OF DECISION - 16

Throughout this process, there was no argument raised by Debtors that the settlement was unreasonable, unfair or improper. Lee admitted that at no time did he instruct Debtors' Attorneys to oppose completion of the settlement or to protest its fairness or terms.

Lee testified that, at the time of the mediation, he talked with his counsel about the alternatives to settlement. He said they told him that, without settlement, there could be years of litigation with significant legal and other costs, and they indicated that notwithstanding the arguments Debtors made in the Action, the executed contracts with Defendant raised serious issues. Lee also testified that he intended to pay the $4.3 million note by the time it came due in April, 2007, and that he turned over to Douglas the process of selling or refinancing Jordan Meadows immediately after the mediation concluded in November, 2006.[21]

Douglas and Alayna immediately attempted to find a buyer for the properties, or a developer, or someone to lend the $4.3 million required to take out Defendant. The Wentworth Development interest, known to Douglas and Alayna and to Debtors, never materialized. Douglas indicated that Wentworth decided to

---

[21] Debtors noted repeatedly in briefing and at trial that Lee is diabetic, and that the mediation occurred over an extended period with one meal break. Douglas testified that Lee appeared "shaky" at the conclusion of the mediation. However, Debtors failed to prove that this condition, or other medical conditions, or Lee's age somehow negate the effectiveness of the mediation. None of these conditions were ever raised by Debtors' Attorneys in protest of the settlement. Debtors also stopped short of expressly arguing to this Court that medical conditions impacted Lee's participation in the mediation or vitiated the effectiveness of the settlement. The Court concludes, on the record presented, that these matters are irrelevant to the issues that are to be decided herein.

MEMORANDUM OF DECISION - 17

pull out of the Treasure Valley market and focus its efforts elsewhere. That

occurred in January, 2007, and Douglas and Alayna intensified efforts thereafter,

talking with numerous parties and following numerous leads. However, they and

Debtors did not cause the property to be listed nor any signs erected advertising its

availability for sale.

Initially, Debtors sought $32,000.00 per entitled paper lot which, for 315

lots would be $10,086,000.00 (equivalent to about $100,000.00 per acre). The

asking price later dropped to $28,000.00/lot or a total of $8,820,000.00 (about

$88,000.00 per acre).

No buyer, investor or lender was located. Debtors were unable to make the

payment due Defendant in April, 2007. Nor had they made any payments prior to

that date. Debtors asked Defendant for an extension of the note's due date, which

was refused. In May, 2007, Defendant commenced a nonjudicial foreclosure

process.[22] Sale was scheduled for August 24, 2007, and Debtors filed their chapter

11 case on August 13, staying that sale.

## III.    DISCUSSION AND DISPOSITION

### A.    Context and contentions

The parties take starkly different views of the transfer that occurred in

---

[22] After the default, Debtors listed the property. See Exs. 235 (May, 2007, listing at
$8,000,000.00); 236 (June, 2007, listing at $7,500,000.00); 237 (June, 2007, listing at
$6,430,000.00). When Debtors filed their petition on August 13, they listed the property at a
value of $6,430,000.00. Ex. 123 at sch. A.

MEMORANDUM OF DECISION - 18

consummation of the Mediation Agreement.

Plaintiffs argue that no more than $1,859,856.07 of "reasonably equivalent value" was transferred to Debtors in return for the note and deed of trust. *See*, *e.g.*, Adv. Doc. No. 17 (Post-trial brief) at 2-3, 21.[23] Thus, they contend the transfer to Defendant in excess of that amount (*i.e.*, $2,482,490.25) should be avoided as a fraudulent transfer under § 548(a)(1)(B), and the deed of trust secured note reduced to the $1,859,856.07 figure. In this analysis, Plaintiffs concede value given of $1,550,000.00 (the advance to purchase the Sweet Jean Parcel), $200,000.00 (prior loans to Debtors), $12,000.00 (the cul-de-sac parcel), and approximately $98,000.00 (engineering and related development expenses paid directly or reimbursed).

Defendant contends that given the value of the real property at the time of the transfer, and the release of his contract claims for specific performance or breach, together with the funds he advanced Debtors both prior to and as a result of the mediation, Debtors received "reasonably equivalent value" for the amount of the secured obligation he received.

Resolution of the fraudulent transfer contentions is prerequisite to consideration and resolution of the § 362(d) issues, as the extent of Defendant's

---

[23] They initially urge a reasonably equivalent value of $1,847,856.07, accepting the figures in Ex. 244, but acknowledge that inclusion of the $12,000.00 Defendant expended for the cul-de-sac parcel would yield the $1,859,856.07 figure. *Id.*

MEMORANDUM OF DECISION - 19

secured claim is a critical factor in analyzing that latter issue.

### B. Fraudulent transfers under § 548(a)(1)(B)

There are multiple elements that must be established by a plaintiff to sustain a cause of action under § 548(a)(1)(B). There must be a "transfer" of property of the debtor that occurs within two years of the filing of the bankruptcy petition. The debtor must have received less than "reasonably equivalent value in exchange for the transfer" and the transfer had to have occurred when the debtor was insolvent or the debtor had to be rendered insolvent as a result of the transfer. Plaintiffs bear the burden of proving all these elements in order to recover under § 548. *Krommenhoek v. Natural Res. Recovery, Inc. (In re Treasure Valley Opportunities, Inc.)*, 166 B.R. 701, 703, 94 I.B.C.R. 55, 56 (Bankr. D. Idaho 1994).

### 1. "Transfer"

The Code broadly defines transfer in § 101(54) as every "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property, or (ii) with an interest in property." "Transfer" also includes "retention of title as a security interest" and "foreclosure of a debtor's equity of redemption[.]" Section 101(54). *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994), recognizes the applicability of § 101(54) to constructively fraudulent transfer assertions under § 548. *See also Hopkins v. D.L. Evans Bank (In re Fox Bean Co.)*, 287 B.R. 270, 281, 02.4 I.B.C.R. 185, 189 (Bankr. D. Idaho

MEMORANDUM OF DECISION - 20

2002) (same).  The "granting of security for a debt is a transfer."  *Hughes v.*

*Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997).

Thus, here, the granting of the deed of trust to Defendant is a transfer of the

Debtors' property for purposes of § 548(a)(1)(B).

When that transfer occurred (for the purposes of § 548) is governed by

§ 548(d).  That section establishes the date of transfer as the date "when such

transfer is so perfected that a bona fide purchaser from the debtor against whom

applicable law permits such transfer to be perfected cannot acquire an interest in

the property transferred that is superior to the interest in such property of the

transferee."  In connection with the transfer of an interest in Debtors' real estate

under the subject deed of trust, perfection requires recordation in the Canyon

County real property records.  The deed of trust was recorded on November 21,

2006.  That, therefore, is the date of transfer.  Such date was within two years of

the Debtors' August 13, 2007, bankruptcy filing.

### 2.    "Reasonably equivalent value"

The key to this matter is determining the value received by Debtors in

exchange for the interest they transferred to Defendant.  Debtors must establish

that they "received less than a reasonably equivalent value" in order to satisfy the

requirement of § 548(a)(1)(B)(i).[24]

---

[24]  If that element is established by a preponderance of the evidence, then Plaintiffs must
(continued...)

MEMORANDUM OF DECISION - 21

### a.    Authorities

There is a two step process required to determine whether a debtor received a reasonably equivalent value.  First, it must be determined that the debtor received value.  "Value is defined for purposes of section 548 of the Code as 'property, or the satisfaction or securing of a present or antecedent debt of the debtor[.]"  *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 595 (9th Cir. 1991) (quoting § 548(d)(2)(A)).  A transfer is for value if one is the quid pro quo of the other.  *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (8th Cir. BAP 2001) (citing 2 David G. Epstein, Bankruptcy § 6-49 at p. 33.

Second, the Court must determine whether that value was reasonably equivalent to what the debtor gave up.  The determination of "reasonable equivalence" is largely a factual question, to which latitude is given the trier of fact.  *Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*, 850 F.2d 342, 344 (8th Cir. 1988).  In order to determine whether a fair economic exchange has occurred, the court must analyze all the circumstances surrounding the transfer in question.  5 Collier on Bankruptcy ¶ 548.05.[1][b] at 548-35 (Alan N. Resnick & Henry J. Sommer eds., rev. 15th ed. 2007).

The determination of reasonable equivalence must be made as of the time

---

[24](...continued)
next establish one of the conditions set forth in § 548(a)(1)(B)(ii)(I) through (IV).

MEMORANDUM OF DECISION - 22

of the transfer. *BFP*, 511 U.S. at 546; *Treasure Valley Opportunities*, 166 B.R. at 704; Collier, ¶ 548.05[1][b] at 548-38.[25]

Whether a debtor received a reasonably equivalent value is analyzed from the point of view of the debtor's creditors, because the function of this element is to allow avoidance of only those transfers that result in a diminution of a debtor's prepetition assets. *Fox Bean Co.*, 287 B.R. at 281 (citing *Roosevelt v. Ray (In re Roosevelt)*, 176 B.R. 200, 206 and 208 (9th Cir. BAP 1994)). *See also Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004) (the "primary focus . . . is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors."); *Viscount Air Servs., Inc. v. Cole (In re Viscount Air Servs., Inc.)*, 232 B.R. 416, 435 (Bankr. D. Ariz. 1998) (noting that the focus is whether the net effect of the transaction has depleted the bankruptcy estate).

The concept is not particularly esoteric; a party receives reasonably equivalent value if it gets roughly the value it gave. *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3rd Cir. 2007). *See also Lindquist v. JNG Corp (In re Lindell)*, 334 B.R. 249, 255-56 (Bank. D. Minn. 2005) ("A determination of reasonably equivalent value is fundamentally one of common sense, measured

---

[25] This Court also noted in *Treasure Valley Opportunities* that "[s]ubsequent appreciation or depreciation should not, and does not, transform a transfer for reasonably equivalent value into a fraudulent transfer," 166 B.R. at 704 (citing 4 Collier on Bankruptcy ¶ 548.09[1] at 548-116 (15th ed. 1993)).

MEMORANDUM OF DECISION - 23

against market reality." (quotation omitted)).

Reasonable equivalence does not require exact equality in value. *Kendall v. Carbaat (In re Carbaat)*, 357 B.R. 553, 560 (Bankr. N.D. Cal. 2006)*; see also BFP,* 511 U.S. 531, 540 n.4 (1994) ("Our discussion assumes that the phrase 'reasonably equivalent' means 'approximately equivalent,' or 'roughly equivalent.'").

Indirect benefits, as well as direct benefits, may constitute value if sufficiently concrete and identifiable. This Court has stated: "Beyond looking at what is exchanged in a *quid pro quo* transaction, it is important to examine the value of all benefits inuring to a debtor by virtue of the transaction in question, directly or indirectly." *Fox Bean Co.*, 287 B.R. at 281 (citing *Richards & Conover Steel*, 267 B.R. at 612-13).[26]

Reasonable equivalence can clearly include the elimination of claims or litigation. In *United Energy*, the court recognized that § 548(d)(2)(A) defined value as including "satisfaction or securing of a present *or antecedent debt*." 944 F.2d at 595. Further, it noted, "debt" is defined in § 101(12) as liability on a claim

---

[26] In *Sullivan v. Schultz (In re Schultz)*, 368 B.R. 832 (Bankr. D. Minn. 2007), the court noted that if reasonable equivalence is predicated on the value of an indirect benefit then that benefit must by "tangible." *Id.* at 836. This Court has previously noted, however, that construing reasonably equivalent value as limited to only "tangible goods and services" is too narrow, and that the test is instead whether the transfer "conferred an economic benefit on the debtor" and can include indirect financial benefits. *Treasure Valley Opportunities*, 166 B.R. at 705-06 (citations omitted). The two articulations are complimentary and not in conflict. Indirect economic and financial benefits to a debtor can provide reasonably equivalent value if they are sufficiently "tangible" to be evaluated, and they need not be "tangible goods or services" to so qualify.

MEMORANDUM OF DECISION - 24

and "claim" is broadly defined in § 101(5), and it determined the Code's

definitions, legislative history and judicial construction supported a broad and

expansive construction of the term debt, including the use of that term in § 548.

944 F.2d at 595.  It thereafter concluded that payments reduced the liability of the

estate on potential fraud or restitution claims and ultimately benefitted the

unsecured creditors of the estate.  *Id.* at 596.[27]

*Barclay v. MacKenzie (In re AFI Holding, Inc.)*, 525 F.3d 700 (9th Cir.

2008), found that a transfer was made with actual fraudulent intent and affirmed its

avoidance.  Then, in considering an issue of a "good faith exception" to avoidance

under a California statute which required a finding of reasonably equivalent value,

the court considered whether its decision in *United Energy* controlled.[28]  That

precedent, the court noted, established that investors had provided reasonably

equivalent value for the payments they received, because those investors "had

claims for rescission and restitution" that were proportionately reduced.  *Id.* at 706.

The court concluded that *United Energy* required it to "delve beyond the 'form' to

---

[27]  Three years later, this Court in *Treasure Valley Opportunities* followed the *United Energy Corp.* approach to "value," debt" and "claim," and considered two types of benefits received by a debtor (1) a discharge of an obligation to pay the transferee under contract terms and (2) benefit in the form of the continued vitality of a contract.  166 B.R. at 704-06.

[28]  *AFI Holdings* dealt with an actual fraudulent transfer under California's fraudulent transfer statute.  The court noted California's fraudulent transfer statute was similar in form and substance to the Bankruptcy Code, and as such, analysis of the Code was persuasive.  *Id.* at 703. In *AFI Holdings*, the reasonably equivalent value question was critical to a safe harbor or good faith exception for transferees, similar to § 548(c).  *Id.*  The court's analysis in *AFI Holdings* and *United Energy* does not indicate that a different approach to reasonably equivalent value would attend § 548(a)(1)(B).

MEMORANDUM OF DECISION - 25

the 'substance' of the transaction" to determine whether reasonable equivalence was received. *Id.* at 708.[29]  It concluded that "MacKenzie acquired a restitution claim at the time he bought into Eisenberg's Ponzi scheme, just as the investors in *United Energy* acquired a restitution claim at the time they bought their solar modules." *Id.*  It therefore determined the good faith exception was available as to the principal amount of the investment, but that the fictitious gain, being in excess of the "restitution claim" was correctly avoided. *Id.* at 709.

Finally, the analysis of the court in *Schaps v. Just Enough Corp. (In re Pinto Trucking Service, Inc.)*, 93 B.R. 379 (Bankr. E.D. Pa. 1988), is apropos. There, the court found a trustee for a chapter 7 business failed to establish the debtor did not receive reasonably equivalent value in a prebankruptcy, arms-length negotiated settlement of multifaceted disputes.  The court held that "there is no question that the compromise of a dispute can supply the element of consideration in a contract."  93 B.R. at 389 (citations omitted).

> While it is true that a totally groundless claim or a non-dispute may not constitute consideration, the courts will not look at the underlying merits of a compromise very critically to determine its worth.  "The sufficiency of the consideration for a compromise is not to be

---

[29]  In *AFI Holdings*, the transfer at issue was distribution to an investor (MacKenzie) as a purported limited partner in AFI, which was a Ponzi scheme operated by Gary Eisenberg. MacKenzie had invested $73,400.00.  In connection with his withdrawal, he received payments totaling $89,824.18, with $73,400.00 representing return of the principal investment and the balance as a "fictitious gain" thereon.  *Id.* at 702.  The court considered whether the transfer was a distribution on account of a partnership interest relative to an investor's capital contribution and avoidable under *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528 (9th Cir. 1990), or a transfer in exchange for a proportionately reduced restitution claim under *United Energy*.  *Id.* at 704.

MEMORANDUM OF DECISION - 26

> determined by the soundness of the original claim of either party. The
> very object of that compromise is to avoid the risk or trouble of that
> question."

*Id.* (citations omitted). In *Pinto Trucking*, the settlement-transfer included release

of certain litigation claims. Among the factors the court considered as supporting

the conclusion that reasonably equivalent value or fair consideration was

exchanged by each side was that the settlement was a negotiated, arms-length

transaction resolving a "confusing array of charges and counter-charges." *Id.* at

389-90.[30]

### b.    Application

Plaintiffs' focus on the new loan of $1,550,000.00 and the other cash or

cash equivalent aspects of the transaction (the $200,000.00 prior loan, the

development costs paid, etc.) is understandable. All agree that these monetary

considerations reflect reasonably equivalent value for the transfer of the security

interest in the real estate.

But limiting the field of vision to just these aspects is erroneous. When

considering the totality of the circumstances and the entirety of the economic

transaction, Debtors received other benefits, such as the elimination of

---

[30] The court later clarified its ruling and approach in *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R. 610 (Bankr. E.D. Pa. 1989). It emphasized its earlier decision did not automatically exclude all litigations settlements from possible avoidance as fraudulent transfers under § 548, just those with sufficient indicia of fairness and adequacy of consideration, as was the case with the clearly adversarial litigation in *Pinto Trucking*, settled through negotiation at arms-length and with no suggestion of collusion. *Id.* at 619-20.

MEMORANDUM OF DECISION - 27

Defendant's litigation claims, that must be included. And the totality analysis must include consideration of the value of the real property as of the date of the transfer in November, 2006. *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1990) (noting that reasonable equivalence is not wholly synonymous with market value, but market value is an extremely important factor to be considered in the court's analysis).

### i.    Value of the real property

Defendant's appraiser, Mark Richey, MAI, determined that the value of the subject real estate as of November, 2006, was $7,550,000.00. This figure translates to $75,000.00 per acre for his calculated 100.67 acres. While Plaintiffs attempted to cast doubts on the appraisal through cross examination, the strength of the expert opinion was not materially diminished.

Plaintiffs did not offer any competing expert testimony regarding the valuation of the property. However, Lee testified that at the time of the mediation in the fall of 2006, the property was worth between $70,000.00 and $100,000.00 per acre. This results in a value of between $7,000,000.00 and $10,000,000.00 for the approximately 100 acres at issue.[31]

Though Douglas is neither qualified as an expert nor is the owner of the property entitled to opine as to its value, he was involved in the development of

---

[31] As noted previously, Debtors' Attorneys sent a May, 2006 buy-out proposal to Defendant that referenced an estimated then-current value of about $75,000.00 per acre. Ex. 209.

MEMORANDUM OF DECISION - 28

the property and the solicitation of interest from buyers or financiers, and he was involved in the attempts to sell the property commencing immediately after the mediation.  He testified that at the time of the mediation, there was an outstanding letter of intent on the property at $89,000.00 per acre or $8,900,000.00 for the 100 acres.  Under cross-examination, he testified that during the sale efforts in late 2006, he was asking $32,000.00 per "paper" or entitled lot which, for 315 lots, would be the equivalent of $10,086,000.00 (or slightly over $100,000.00 per acre).  That figure was dropped to $28,000.00 per lot, or $8,820,000.00 total ($88,200.00 per acre) during the winter and spring of 2007.

Additionally, though the property was not formally listed for sale by Debtors until after they defaulted on Defendant's note, the eventual listing in May, 2007, was at $8,000,000.00 and the following month was $7,500,000.00.  Also, when Debtors filed their chapter 11 petition in August, 2007, they listed the value of the property at $6,430,000.00.[32]

All of this evidence supports a value of the property significantly in excess of the $4.3 million note to Defendant secured by the deed of trust.  Further, given Debtors' scheduled value, Lee's testimony of value, the contemporaneous assertion of value in the demand letter from Debtors' Attorneys, and the non-

---

[32] Assertions in a debtor's schedules made under penalty of perjury may be considered by the Court as evidentiary admissions under Fed. R. Evid. 801(d).  *In re Martell*, 349 B.R. 233, 234 n.1, 05.2 I.B.C.R. 27 n.1 (Bankr. D. Idaho 2005) (citing *In re Moore*, 01.4 I.B.C.R. 147, 149 n.7 (Bankr. D. Idaho 2001)); *In re Webb*, 03.1 I.B.C.R. 25, 26, 2002 WL 33939737 *4 (Bankr. D. Idaho 2002).

MEMORANDUM OF DECISION - 29

expert testimony reflecting the offering prices for the property and manifested

perceptions of value by Debtors and Douglas as of November, 2006, there is no

cogent reason to discount the estimate Mr. Richey provided.  Mr. Richey's

appraisal was competently and persuasively supported, and Plaintiffs' attempted

impeachment was not persuasive.

The value of the property as of November, 2006, was $7,550,000.00.

### ii.    The transaction

In evaluating the entirety of the transaction in order to determine reasonable

equivalence, it is critical to recognize the context of the litigation, including

Defendant's claims satisfied through the settlement and the transfer of the deed of

trust in consummation of that settlement.  Debtors commenced the Action to

negate and avoid the purchase contracts, arguing that the descriptions of the real

property therein were not sufficiently detailed to meet Idaho's Statute of Frauds,

and they added assertions of fraudulent inducement once the suit had been

removed.  Defendant counterclaimed to specifically enforce those contracts or,

alternatively for damages for Debtors' breach and failure to perform those

contracts.

Under the contracts, Parcels 1 and 3 were to be sold to Defendant for

$55,000.00 per acre, and he had a contractual claim to assignment of the Debtors'

contract to acquire the Sweet Jean Parcel for $37,500.00 per acre.  Given the value

of the property at the time the disputes peaked and the litigation occurred, the

MEMORANDUM OF DECISION - 30

anticipated profit to Defendant on those contracts was substantial.[33]  Of course, there were other disputes pending that could have restricted Defendant's realization of that value, including the contentions about the formation and operation of Jordan Meadows LLC, Douglas' role in the development, the financing and completion of the Sweet Jean Parcel's purchase and the "partnership" sharing in the upside of that acquisition, and the like.

In context, the outcome of the mediation appears logical enough.  Debtors were regaining the ability to deal with the entirety of the real property to their own benefit, free from the litigation threat of Defendant who sought to enforce his purchase agreements.[34]  Debtors also received the financing required to consummate the purchase of the Sweet Jean Parcel and unify the 100 acres.  The potential upside to Debtors, given what they then believed was the value of the real property, was substantial.  They did, however, relinquish their litigation

---

[33]  The contract on parcel 1 was $1,417,900.00 (25.78 acres at $55,000.00 per acre), and on parcel 3 was $2,165,350.00 (39.37 acres at $55,000.00).  The cost of Sweet Jean Parcel was $1,500,000.00 (40 acres at $37,500.00 per acre).  The total cost for the 100 acres of $5,083,250.00 was substantially below the 2006 letters of intent of $11,000,000.00 to $14,265,000.00 (D.H. Horton) and $8,904,000.00 (Wentworth) or the $7,500,000.00 referenced by Debtors' Attorneys in correspondence.

[34]  Debtors spend a good deal of time arguing that the theory of "equitable conversion" is unavailable to Defendant.  This argument appears engendered by Defendant's earlier contentions in pretrial briefing that he "gave back" the properties to Debtors.  The focus on the theory is misguided.  While Debtors are correct that equitable conversion does not apply to an unconsummated real estate purchase contract as at issue here, they discount the fact that Defendant settled a claim for the enforcement of those contracts.  That settlement freed Debtors to deal with the property without the lis pendens and the shadow of specific performance of the earlier executed agreements (or damages for their alleged breach), even if those agreements did not equitably convert Defendant's contract claim into an equitable real property interest.

MEMORANDUM OF DECISION - 31

claims that they hoped would enable them to reclaim the property free of

Defendant's interests and claims.  That they could successfully do so, or what that

effort would cost in time, legal costs, and jeopardy to the project, were unknowns.

Defendant was recovering, under the agreement, his prior out of pocket

expenditures.  However Defendant was also receiving something in return for

releasing his contract claims to real property.  At that time, the real property was

significantly increasing in value, well in excess of what he had agreed in the

contracts to pay.  The contract claims, whether for specific performance or for

breach, had value.  Thus Debtors agreed, inter alia, to pay Defendant

$2,660,000.00 in addition to repaying the new $1,550,000.00 he agreed to lend

them in order to purchase the Sweet Jean Parcel.  To secure the repayment of all

amounts, Defendant obtained security through a deed of trust.

As with virtually all mediated settlements, the deal was not perfect from

either perspective.  But it provided a resolution to uncertain and expensive

litigation, and provided substantial real benefits to both sides.

Lee admitted his attorneys told him, during the mediation, that the

alternative to settlement would be months if not years of litigation and sizeable

legal expense.  Though Lee did not testify as to his or his attorneys' perceptions of

their chance of success, *i.e.*, the merits of their Statute of Frauds argument or the

lack of perceived merit in Defendant's counterclaim, the projection of time and

cost is indicative of a belief that Debtors were not likely to promptly and

MEMORANDUM OF DECISION - 32

unequivocally succeed in the Action.

The value of the property drove the deal. It is entirely irrational to assume Debtors would have settled on these terms if the value of the real property had not been, in their view, sufficiently in excess of the $4.3 million that they agreed to secure. And, because they agreed to pay this amount within roughly six months, they had to believe the real property's value would allow them, in short order, to obtain an additional investor or find third party financing, and allow them to pay the note to Defendant and retain the equity and future value or sell the property for enough to satisfy the note and realize the excess.

As Defendant notes, his agreement not only released Debtors from the purchase contracts, he also facilitated the acquisition of the Sweet Jean Parcel which was required to aggregate the three parcels into a single development, consistent with the engineering and development plans. This, then, would further assist Debtors in finding a buyer or an investor within the roughly six month window before the new note came due, given that the annexation and platting was for the entire 100 acre development.

The $1,550,000.00 new loan, the prior $200,000.00 personal loan, and the engineering and other costs incurred by Defendant through the date of mediation, were all included in the new $4.3 million note. Debtors correctly observe that Defendant did not have fee title (through equitable conversion or otherwise) to convey. But Debtors unduly discount the value that they received in the

MEMORANDUM OF DECISION - 33

settlement from Defendant's release of the specific performance and breach of contract claims he asserted under the purchase contracts. Such a settlement and release provided substantial and sufficiently concrete benefits. Under the totality of the circumstances, Debtors received reasonably equivalent value. From the point of view of their creditors, Debtors' estate was not diminished.

Plaintiffs have not sustained the burden of establishing by a preponderance of the evidence that the transfer of the deed of trust to Defendant on November 21, 2006 was constructively fraudulent under § 548(a)(1)(B).[35] Judgment will therefore be entered in favor of Defendant in the adversary proceeding.

### C.    Relief from the § 362(a) automatic stay

Defendant sought stay relief, and that matter was simultaneously tried as a final hearing under § 362(e). The Court concludes that a right to stay relief has been established on the evidence.

Defendant's motion is brought under § 362(d)(1) which provides for stay relief "for cause, including the lack of adequate protection of an interest in

---

[35] Plaintiffs failed to prove the element of reasonably equivalent value under § 548(a)(1)(B)(i). This eliminates the need for the Court to address the elements under § 548(a)(1)(B)(ii), such as whether Debtors were insolvent when the transfer was made in November, 2006 or became insolvent as a result of that transfer, *see* § 548(a)(1)(B)(ii)(I). However, the $7,550,000.00 value of the real estate at the time of transfer of the deed of trust, as found above, and the then-extant equity in the real property notwithstanding this transfer, would indicate that Debtors were neither then insolvent nor by the transfer rendered insolvent. Even as late as the date of the filing of the bankruptcy petition, Debtors were asserting they were solvent in a balance sheet sense. *See* Ex. 123 (summary of schedules showing assets worth $7,851,610.94 and liabilities of $6,451,748.98); § 101(32) (defining "insolvent"); *Fox Bean Co.*, 287 B.R. at 282 (applying § 101(32) for § 548(a)(1)(B)(ii) purposes).

MEMORANDUM OF DECISION - 34

property" of the movant.  The motion was also brought under § 362(d)(2) which

provides for stay relief with respect to an act against property of the estate if the

debtor does not have equity in the subject property and that property "is not

necessary to an effective reorganization."  Under § 362(d)(3), which Defendant

added as a basis for stay relief, the stay of an act against "single asset real estate"

by a creditor secured therein shall be terminated unless by the later of 90 days

after the petition date or 30 days after the Court determines the debtor is subject to

the single asset real estate provisions, the debtor has filed a plan "that has a

reasonable possibility of being confirmed within a reasonable time" or has

commenced payments to the creditor that are in an amount equal to interest on the

secured obligation at the nondefault contract rate.

### 1.    Value and Debtors' equity

In the context of stay relief, "equity" exists if the value of the property

exceeds all claims secured by such property, whether those claims belong to the

moving creditor or others.  *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400

n.2 (9th Cir. 1984); *see also Stewart v. Gurley*, 745 F.2d 1194, 1196 (9th Cir.

1984).  An "equity cushion" is also dependent on the value of the subject property.

An equity cushion exists where the value of the property is sufficient to fully

secure the moving creditor, even if there is insufficient value to provide the debtor

with equity when creditors junior to the movant are also considered.  *Mellor*, 734

F.2d at 1400 n.2.  Equity cushions are an accepted form of providing adequate

MEMORANDUM OF DECISION - 35

protection to creditors during bankruptcy.  *Id.* at 1400.  Determining the presence

of an equity cushion necessarily requires a determination of the collateral's value

during the bankruptcy when it is proposed to be used to protect the stayed creditor.

Mr. Richey opined that the value of the 100 acres securing Defendant, as of

the hearing in May, 2008, was $4,000,000.00.  This is obviously a dramatic drop

from his estimate of $7,550,000.00 just six months earlier when the deed of trust

was executed and recorded in November, 2007.

Mr. Richey explained that while the subject property still retained the

characteristics that made it an attractive candidate for subdivision development,

such as its proximity to employment centers, shopping, schools and ease of access

to the Interstate, the market had substantially changed.  He testified that starting in

the fall of 2006, the residential mortgage and housing market started to "shudder"

and then commenced a decline that continued through all of 2007.  His report

describes the nature of the change and the impact on the value of Jordan

Meadows:

> [E]conomic uncertainties have created a pause in the residential land
> development sector of this market.  The result has been a surplus of
> available land until lot inventories come into balance.  Asking prices
> vary significantly from the highs received during the 2005-2006 era in
> excess of $60,000-to-$80,000 [per acre] to lows of $40,000.  Real
> estate activity has been non-existent for undeveloped residential
> development land.  However, where sales have occurred, prices have
> been reduced from 40-to-60 percent of the former market levels.
>
> I have summarized the single-family dwelling unit construction for this
> area over the recent past.  This information was obtained from the

MEMORANDUM OF DECISION - 36

<u>Wells Fargo, Idaho Construction Report</u>.

|          | 2004      | 2005      | 2006      | 2007     |
|----------|-----------|-----------|-----------|----------|
| Caldwell | 643 DUs   | 980 DUs   | 1,181 DUs | 586 DUs  |
| Nampa    | 1,155 DUs | 1,430 DUs | 1,142 DUs | 287 DUs  |

> The 2005 and 2006 era could prove to be an all-time high for this neighborhood. Noting this, the single-family residential construction decline from the 2005-2006 era to 2007 was about 45 percent for Caldwell and 75 percent for Nampa. My investigation does not indicate any significant improvement for 2008.

Ex. 247 at 8-9.

> The problem associated with the subject [property] is that the local market is in an economic slump where residential subdivision development has practically ceased. If the subject is developed, as "preliminar[il]y platted," an additional 318 lots would be put on a saturated market. According to New Home Trends, Inc., March 3, 2008, report, the current supply of available detached building lots in Canyon County is approximately 5,195, or a 5.40-year supply. The addition of the subject's 318 lots would increase the absorption to 5.75 years assuming no other developments are brought on line and demand remains at 962 homes per year over the near term. However, the New Home Trends, Inc., report identifies an additional 123 plats including 14,008 lots that are proposed for Canyon County. This indicates a sum of 19,203 lots, or a 20-year supply at their demand estimate of 962 lots annually.

*Id.* at 12-13.

> Residential development land sales are non-existent in the subject neighborhood. The land market in which the subject competes has been in decline since the fall of 2006. Prior to this date, land sales in this neighborhood were occurring at prices that ranged from $50,000 to $85,000 per acre depending on location and proximity to services. The over-supply of residential building lots compounded by the uncertainty with anything related to real estate has had a dramatic

MEMORANDUM OF DECISION - 37

effect on this class of real property.

*Id.* at 25.[36]

Mr. Richey concluded that the value of the property as of hearing was

$4,000,000.00. Debtors presented no affirmative evidence of value in opposition.

Following trial, Debtors asserted that upon all the evidence "this Court should

conclude that the value of the subject property, consisting of approximately 100

acres, should fall within the range of $55,000.00 an acre for both November of

2006 and May of 2008." Adv. Doc. No. 17 at 26.[37] However, the Court finds

---

[36] In contrast to the dire 2008 situation, Mr. Richey's evaluation of the property as of November, 2006 included the general observation that "From all indications, market is strong for building lots, and real estate activity for development land is brisk." *Id.* at 31. Though that was true from the perspective of the developers and market at that point in time, events would quickly prove their optimism illusory. As Mr. Richey considered comparable properties and evaluated the subject's value as of 2006, and in explaining why certain of the comparable properties' data stemmed from offers that failed to close, he explained:

> The market data indicates the value of the subject to range from about $44,000 to $84,000 per acre. All of the data is from the mid-2005 to late 2006 era. The 2005 and early 2006 data indicates values in the $44,000-to-$55,000 range. Subsequent to this time frame, prices escalated to the $65,000-to-$84,000 per acre range. In hindsight the market was slowing, and the late 2006 contracts did not close. Many of the comparables are in proximity to services and had preliminary engineering in place, generally similar to the subject given market conditions as of 2006. The subject had excellent location amenities in 2006 regarding to proximity, developing subdivisions, and schools.

> . . . The market was changing on this valuation date. Sales prices did not reflect the change, but the sales that were failing were a precursor to the market's current distressed condition.

*Id.* at 34. Debtors' attacks on Mr. Richey's use of "offers" or failed sales rather than closed sales in his analysis of comparable properties was understandable, but Mr. Richey cogently explained his approach.

[37] In objecting to the motion for stay relief, Debtors alleged a "value which exceeds $6,400,000.00." *See* Case No. 07-01264-TLM, Doc. No. 51 at 3. And in pretrial briefing, they

(continued...)

MEMORANDUM OF DECISION - 38

Debtors did not prove that value and their attempt to substantially impeach Mr.

Richey's estimate of value as of the date of trial was not persuasive.  At a value of

$4,000,000.00, there clearly is no equity for the Debtors as such value is less than

the face amount of the note and deed of trust.[38]

### 2.    Cause and lack of adequate protection

Debtors have made no payments on the note.  They concede that they have

no funds or resources with which to make payments, whether "adequate

protection" payments or otherwise.  The property has not sold and there are no

prospects for sale.  Debtors have identified no potential investors.  Lee and

Douglas both testified that there was a significant possibility (as much as 75%

according to Douglas) that the existing approved subdivision plat would be

allowed to expire and would not be pursued in the current dismal market for such

developments.

Lack of payment on the note and the absence of any other post-default

payments constitute cause for relief.  There is no "equity cushion" providing

---

[37](...continued)
stated that "The Jordans believe the evidence of value will show a value of the 100 acres that
exceeds $5,000,000.00."  Adv. Doc. No. 11 at 17 (addressing stay relief contentions).

[38]  Even Debtors' suggested value of $5,500,000.00 would establish minimal equity in the
property under § 362(d)(2)(A).  *See* Ex. 240 (Defendant's calculation of amounts due under his
unavoided deed of trust, delinquent real property taxes owed Canyon County, and the existence
of a claim of lien of Briggs Engineering senior to the deed of trust encumbering the property
totaling $5,314,490.14 as of May 6, 2008).

MEMORANDUM OF DECISION - 39

adequate protection in the absence of such payments.[39]  Nor is there any other

proposal to provide such protection to Defendant.  The evidence supports

termination of the stay for cause under § 362(d)(1).

### 3.    Termination under § 362(d)(2)

With a value of $4,000,000.00, Debtors have no equity in the real property.

Defendant's note obligation is, concomitantly, partially unsecured.  Defendant has

carried its § 362(g)(1) burden to show lack of equity.  Debtors have the burden of

proof on § 362(d)(2)(B) – whether the property is necessary to an effective

reorganization.  *See* § 362(g)(2).[40]

The Supreme Court addressed the debtor's burden under § 362(d)(2)(B):

> Once the movant under § 362(d)(2) establishes that he is an
> undersecured creditor, it is the burden of the *debtor* to establish that the
> collateral at issue is "necessary to an effective reorganization."  What
> this requires is not merely showing that if there is to be an effective
> reorganization, this property will be needed for it; but that the property
> is essential for an effective reorganization *that is in prospect*.  This
> means . . . that there must be "a reasonable possibility of a successful
> reorganization within a reasonable time."

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S.

365, 375-76 (1988) (citations omitted).

---

[39] Debtors' argument was based on their fraudulent transfer contentions succeeding,
where their urged value of $5.5 million would leave an ample equity cushion adequate to protect
Defendant if he held a secured obligation of only some $1.9 million.

[40] Section 362(d)(2) requires both absence of equity and lack of need for an effective
reorganization.  *See* § 362(d)(2)(A) ("[D]oes not have equity in such property, *and* . . . .").
However, § 362(g)(1) establishes that the moving creditor has the burden to prove lack of equity
and the "party opposing [stay] relief has the burden of proof on all other issues."

MEMORANDUM OF DECISION - 40

Debtors have filed a plan and a disclosure statement, though further

consideration of the disclosure statement was abated until the fraudulent

conveyance contentions were adjudicated.  During the May trial and hearings,

however, Lee and Douglas Jordan were examined about Debtors' plans and

prospects for the property.  As noted, they both indicated that the approved plat

would likely be abandoned.[41]  What approach would take its place was decidedly

unclear.

Debtors have no cash resources and no disclosed investors or third-party

financing.  They have yet to obtain approval of employment of their realtor or a

"business consultant" they want to hire.[42]  In its most frank, rudimentary form,

Debtors' plan was and is contingent on achieving a substantial reduction in

Defendant's secured claim through the § 548 litigation, and then leveraging the

additional "equity" such successful litigation would create.  The failure of the

litigation removes a critical component from the plan, and there is nothing

presented as an alternative.  Certainly, there is insufficient evidence presented at

the final § 362(e) hearing that meets the standard of a reasonable prospect of

---

[41] Abandonment of the approved Jordan Meadows subdivision might occur voluntarily or, under the evidence, would occur involuntarily if activities did not commence within two years of the city's annexation and plat approval, or November, 2008. Debtors did not identify any resources or alternatives to moving forward with the subdivision should the decision be made to try. If the deadline was not met, the approval process would have to be renewed, and several witnesses acknowledged that under regulations adopted since fall, 2006, the lot sizes would have to be increased over what appeared in Debtors' approved plat. That would require re-engineering and a reduction in total lots, impacting the amounts that could be realized from lot sales.

[42] Both Defendant and the U.S. Trustee have objected to those applications to employ.

MEMORANDUM OF DECISION - 41

reorganization within a reasonable period of time.

Stay relief is therefore also appropriate under § 362(d)(2).[43]

## IV.    CONCLUSION

Based on the foregoing, the Court concludes that judgment will be entered

for Defendant on the complaint in Adv. No. 07-06056-TLM.  Defendant shall

submit a proposed judgment.  Further, Kroneberger is entitled on this record to

relief from the automatic stay under § 362(d)(1) and (d)(2) in Case No. 07-01264-

TLM, and his counsel shall submit a proposed order accordingly.

DATED:  July 1, 2008



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

---

[43]  Given the conclusions under § 362(d)(1) and (d)(2), the Court need not address the additional basis for relief, § 362(d)(3), that Defendant added in his supplement to his motion for relief from stay.

MEMORANDUM OF DECISION - 42